# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### ROCK ISLAND DIVISION

| | | |
|---|---|---|
| TINA ALLEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 09-cv-4038 |
| | ) | |
| MICHAEL ASTRUE, *Commissioner of Social Security*, | ) | |
| | ) | |
| Defendant. | ) | |

## O R D E R  &  O P I N I O N

This matter is before the Court on Plaintiff's Motion for Summary Judgment (Doc. 13) and Defendant's Motion for Summary Affirmance (Doc. 14). On May 25, 2009, Plaintiff filed her Complaint for judicial review, pursuant to 42 U.S.C. § 405(g), of the Commissioner of Social Security's decision denying her benefits. This matter is now fully briefed and ready for disposition. For the reasons stated below, Plaintiff's Motion for Summary Judgment is denied, and Defendant's Motion for Summary Affirmance is granted.

### LEGAL STANDARD

To be entitled to disability benefits under the Social Security Act, a claimant must prove that she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). To determine if the claimant is unable to engage in any substantial gainful activity, the Commissioner of Social Security engages in a factual determination. *See McNeil v. Califano*, 614 F.2d 142, 145 (7th Cir. 1980). The

factual determination is made by using a five-step sequential analysis.  20 C.F.R. §
404.1520; *see also Maggard v. Apfel*, 167 F.3d 376, 378 (7th Cir. 1999).

    In the first step, a threshold determination is made to determine whether the
claimant is presently involved in a substantially gainful activity.  20 C.F.R. §
404.1520(b).  If the claimant is not under such employment, the Commissioner of
Social Security proceeds to the next step.  At the second step, the Commissioner
evaluates the severity and duration of the impairment.  20 C.F.R. § 404.1520(c).  If
the claimant has an impairment that significantly limits her physical or mental
ability to do basic work activities, the Commissioner will proceed to the next step.
At the third step, the Commissioner compares the claimant's impairments to a list
of impairments considered severe enough to preclude any gainful work; and, if the
elements on the list are met or equaled, he declares the claimant eligible for
benefits.  20 C.F.R. § 404.1520(d).

    If the claimant does not qualify under one of the listed impairments at Step
Three, the Commissioner proceeds to the fourth and fifth steps.  At the fourth step,
the claimant's Residual Functional Capacity ("RFC") is evaluated to determine
whether the claimant can pursue her past work.  20 C.F.R. § 404.1520(e)-(f).  If she
cannot, then, at Step Five, the Commissioner evaluates the claimant's ability to
perform other work available in the economy.  20 C.F.R. § 404.1520(g).  The
claimant has the burden to prove disability through Step Four of the analysis, *i.e.*,
she must demonstrate an impairment that is of sufficient severity to preclude her
from pursuing her past work.  *McNeil*, 614 F.2d at 145.  However, once the claimant

shows an inability to perform her past work, the burden shifts to the Commissioner, at Step Five, to show the claimant is able to engage in some other type of substantial gainful employment. *Id*.

Once a case reaches a federal district court, the court's review is governed by 42 U.S.C. 405(g), which provides, in relevant part, "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Maggard*, 167 F.3d at 379 (*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)). A court's function on review is not to try the case de novo or to supplant the decision of the Administrative Law Judge ("ALJ") with the Court's own assessment of the evidence. *See Pugh v. Bowen*, 870 F.2d 1271, 1274 (7th Cir. 1989). A court must only determine whether the ALJ's findings were supported by substantial evidence and "may not decide the facts anew, reweigh the evidence, or substitute [its] own judgment" for that of the ALJ. *See Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). Furthermore, in determining whether the ALJ's findings are supported by substantial evidence, credibility determinations made by the ALJ will not be disturbed "so long as they find some support in the record and are not patently wrong." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994).

However, the ALJ must articulate reasons for rejecting or accepting entire lines of evidence. *Godbey v. Apfel*, 238 F.3d 803, 807-08 (7th Cir. 2000). The ALJ is required to "sufficiently articulate [his] assessment of the evidence to 'assure us

that [he] considered the important evidence . . . and to enable us to trace the path of [his] reasoning.'" *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (*quoting Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

## BACKGROUND[1]

### I.      Procedural History

Plaintiff filed the instant application for disability benefits on either September 28 or October 25, 2005, alleging that her disability had begun on November 25, 2002.[2]  (Tr. 16, 107).  Her application was denied initially and on reconsideration.  (Tr. 58-63, 66-69).  Thereafter, Plaintiff requested a hearing, which was held on October 15, 2008, before ALJ David Thompson.  (Tr. 72, 28-49).  The ALJ issued his decision that Plaintiff was not disabled on December 1, 2008.  (Tr. 13-25).  Plaintiff requested review of the ALJ's decision, which the Appeals Council denied; the ALJ's decision thus became the final decision of the Commissioner.  (Tr. 1-4).

### II.     Relevant Medical History

Plaintiff saw Dr. Thomas Herrmann in September 2003, after Plaintiff returned to the area after a five-year stint living in another area; Plaintiff had worked up until the recent move, but had been unable to find a job after the move.

---

[1]    As Plaintiff only challenges the ALJ's findings as to her mental condition on appeal, the Court does not review the portions of the medical records, hearing testimony, or the ALJ's decision dealing only with her physical condition.  (Pltf's Mem. at 3).

[2]    Defendant asserts that Plaintiff electronically filed her application on October 25, 2005, but the ALJ's opinion notes that she filed it on September 28, 2005.  (Def's Mem. at 2-3 (*citing* Tr. 107); Tr. 16).

(Tr. 291). Noting Plaintiff's history, Dr. Herrmann diagnosed Plaintiff with borderline personality disorder with some mood instability, with which lithium had helped in the past. (Tr. 291). Dr. Herrmann observed that Plaintiff was alert and generally cooperative; had clear thought content and logical association; no hallucinations, delusions, obsessions, or preoccupations; intact mental capacity; and fair insight and judgment. (Tr. 291). He noted that her current affect was "generally euthymic."[3] In October 2003, Dr. Herrmann found that Plaintiff's mood had stabilized "significantly" and that she was "reasonably stable;" he observed that she was "reasonably stable" again in November 2003   (Tr. 289-90).

In January 2004, Plaintiff reported feeling more depressed to Dr. Herrmann, which was due to not being able to get a job and to having family conflict. (Tr. 288). Dr. Herrmann found that Plaintiff was "generally stable," and "doing fairly well" in February 2004. (Tr. 287). On March 2, 2004, Dr. Herrmann noted that Plaintiff's "mood and affect [were] doing fairly well," but on March 31, 2004, she was having some depression and irritability, as well as trouble sleeping. (Tr. 285-86). Plaintiff reported "feeling extremely more depressed" in April 2004. (Tr. 284). In May 2004, Plaintiff was still having "significant depressive symptoms," and Dr. Herrmann assessed her Global Assessment of Functioning ("GAF") score at 50. (Tr. 281, 283).

Plaintiff reported to Dr. Herrmann on June 7, 2004 that she had one or two days at a time when she felt very depressed, but then felt better for three or four days; he assessed her GAF at 55. (Tr. 282). At that time and later in the month,

---

[3]     "Euthymic" is defined as "relating to, or characterized by, euthymia," which means "1. Joyfulness; mental peace and tranquility. [or] 2. Moderation of mood, not manic or depressed." STEDMAN'S MEDICAL DICTIONARY (27th ed. 2000).

Plaintiff reported some problems with concentration, which Dr. Herrmann attributed to one of her medications, of which he reduced the prescribed dosage. (Tr. 280, 282).  Dr. Herrmann saw Plaintiff twice in July 2004.  At the first visit, Plaintiff did "not appear as cognitively impaired," though she reported "a great deal of irritability, anger, almost a paranoid type thinking."  (Tr. 279).  Later in the month, he reported that Plaintiff was doing better.  (Tr. 278).  In August 2004, Dr. Herrmann noted that Plaintiff was no longer taking lithium, and that she was having difficulty with an "unhealthy relationship."  (Tr. 277).  In September 2004, he reiterated that Plaintiff's relationship caused conflict, that she had some agitation, and that she had a fear of sleeping in the dark, though she did "not have actual hallucinations."  (Tr. 276).  In July, August, and September 2004, Dr. Herrmann found that Plaintiff's GAF was 60.  (Tr. 276-78).  In October 2004, Dr. Herrmann found that Plaintiff's GAF was 65, and noted that she was doing "fair," though she had some episodes of being defensive and aggressive.  (Tr. 275).  He recommended that she have counseling in order to return to work.  (Tr. 275).  In November 2004, Dr. Herrmann opined that Plaintiff was "doing reasonably well," and that her GAF was 70.  (Tr. 274).

On April 16, 2005, clinical psychologist Stephen Singley interviewed Plaintiff for a mental status evaluation.  (Tr. 341-44).  He noted that Plaintiff's dress, grooming, and physical appearance were not out of the ordinary, and that her speech was clear, though "flat and monotone." (Tr. 341).  Mr. Singley believed that Plaintiff's intelligence was "within an average to lower average range."  (Tr. 341).

Plaintiff reported that, though she had her GED, she had trouble with reading and writing because she was forgetful and couldn't concentrate; she drove, but tended to avoid situations involving traffic.  (Tr. 342).  Plaintiff did cooking and light cleaning, but required help from her daughter with shopping and heavy cleaning.  (Tr. 342).  Plaintiff reported having nightmares of snakes and spiders, which she termed hallucinations, and being afraid the dark.  (Tr. 342).  After asking Plaintiff a series of questions designed to assess Plaintiff's mental abilities and awareness, Mr. Singley found that she demonstrated "an impaired performance, suggesting short-term memory and/or concentration difficulties."  (Tr. 343).  Mr. Singley concluded by assessing Plaintiff with schizoaffective disorder, depressive type, that was moderate to severe, and a GAF score of 50, which was also the highest estimated GAF score for the last year.  (Tr. 343).  He suggested that Plaintiff's daughter be considered as a payee for benefits, if Plaintiff were to be eligible for them, as he had "mild qualms about her contact to reality currently."  (Tr. 344).

On April 20, 2005, Plaintiff completed an Activities of Daily Living Questionnaire.  (Tr. 137-41).  She reported that she cooks her own meals, cleans, dusts, and does laundry.  (Tr. 137).  Her daughter helped her with her grocery shopping because of her back pain.  (Tr. 137).  Plaintiff noted that she needed help remembering to keep appointments, though not to remember to take her medications, and stated that her attention span was short and she sometimes forgot where she put things.  (Tr. 138).  Plaintiff left her home daily to do errands and keep appointments; someone took her to do these things, which was the same as it

had been before the onset of her current condition.  (Tr. 139).  She also stated that she heard voices or saw people who were not around, though this did not interfere with her activities.  (Tr. 138).  She did not trust most other people, as she feared that they will hurt her or let other people hurt her; on the other hand, she had a few friends that she trusted.  (Tr. 139).  Plaintiff was able to leave home alone.  (Tr. 139).  She reported not sleeping well because she thinks there are snakes and spiders, as well as people biting and hitting her.  (Tr. 139).  Plaintiff noted that she got upset when people told her to do something or criticized her.  (Tr. 140).  Plaintiff often engaged in hobbies, talking on the phone, and paying bills or doing finances, and sometimes read, watched television, or listened to the radio.  (Tr. 140).

On October 24, 2005, Rosemary Jordan completed a mental status exam of Plaintiff.[4]  (Tr. 412-19).  She noted that Plaintiff's appearance was unkempt, that her demeanor was preoccupied, that she had avoidant eye contact and slowed activity, that her speech was clear, that she was irritable and depressed, that she had a constricted affect, and that her thought processes were tangential and loose.  (Tr. 413).   Plaintiff reported having had "hallucinations" involving snakes and spiders for a couple months, and reported having gotten in a physical fight with another woman a year prior.  (Tr. 414).  Ms. Jordan found that Plaintiff had impaired judgment and concentration.  (Tr. 414).  Plaintiff denied any use of illegal drugs or abuse of alcohol, and stated that she had stopped drinking alcohol seven months prior.  (Tr. 415).  Ms. Jordan found that Plaintiff had deficits in impulse

---

[4]     Plaintiff states that Dr. Robert Lawton performed this examination.  (Pltf's Mem. at 5).  However, the record clearly indicates that Rosemary Jordan performed the exam.  (Tr. 419).

control skills, interpersonal skills, anger management skills, and distress tolerance skills, resulting in a moderate level of overall impairment.  (Tr. 417).  Her initial diagnosis was schizoaffective disorder and borderline personality disorder; Ms. Jordan assessed a GAF score of 45.  (Tr. 418).

Dr. Phyllis Brister completed a Mental RFC assessment of Plaintiff on May 24, 2005.  (Tr. 204-07).  She found that Plaintiff was no more than moderately limited in her ability to perform any work activities, and concluded that Plaintiff had "difficulty w[ith] attention which will limit [her] to simple 1-2 step operations of a routine, repetitive nature.  Due to Personality Disorder, [claimant] would do best in socially undemanding and restricted setting.  Retains ability to adapt to routine. Capable of [substantial gainful activity] at this time."  (Tr. 204-06).  On the same day, Dr. Brister conducted a Psychiatric Review Technique, in which she found that Plaintiff had the medically determinable impairments of depression, persistent disturbances of mood or affect, and borderline personality disorder.  (Tr. 208-21). She considered whether Plaintiff met the criteria of Listings 12.04 and 12.08, of 20 C.F.R. Part 404, Subpart P, Appendix 1, and found that Plaintiff did not meet the criteria of either "paragraph B" or "paragraph C."[5]  (Tr. 218-19).

Mr. Singley completed another mental status examination of Plaintiff on February 11, 2006.  (Tr. 377-80).  He found that not much had changed since his previous examination in April 2005, or since the first examination in 2003.  (Tr. 379).  Plaintiff reported that in her last job, with a towing company, she was not

---

[5]     "Paragraph B" and "paragraph C" are explained further below, in connection with the ALJ's analysis.

fast enough and had to be moved to a filing position, but was let go because she had to be taken to the hospital for chest pains on several occasions.  (Tr. 378).  Plaintiff also reported that she had trouble remembering what she read, but could drive "with no special problems;" Plaintiff engaged in cleaning, cooking, personal hygiene, and laundry, though she needed help with heavy activities.  (Tr. 378).  Mr. Singley said that Plaintiff's mental confusion and communicative effectiveness were problematic, and there was "less than a borderline ability to take adequate care of herself occupationally."  (Tr. 379).  Mr. Singley noted that Plaintiff had a history of periodic alcohol abuse, though she was currently in a period of remission, which indicated that a payee for benefits would be appropriate if benefits were awarded.  (Tr. 379).  Mr. Singley suggested that Plaintiff had schizoaffective disorder, possible somatoform disorder, a history of alcohol abuse, and probable borderline intellectual functioning; he assessed a current GAF score of 45, with the highest in the past year estimated at 50.  (Tr. 379-80).

Dr. Kirk Boyenga completed a Mental RFC assessment of Plaintiff on March 2, 2006.  (Tr. 381-84).  He found that Plaintiff was no more than moderately limited in any work activities.  (Tr. 381-82).  He also found that Plaintiff "demonstrates no serious limitation of orientation or thought and can cook, clean, do laundry, make purchase, pay bills, sew and attend meetings, except as limited by physical problems," and that she was "capable of performing simple tasks."  (Tr. 383).  He noted that her "social skills are impaired, but allow settings with reduced interpersonal contact," and that she was able to maintain family relationships.  (Tr.

383).  Plaintiff's "ability to follow instructions and travel independently" showed her ability to perform "routine repetitive tasks."  (Tr. 383).   This assessment was reviewed and affirmed on July 26, 2006.  (Tr. 423-24).  Also on March 2, 2006, Dr. Boyenga completed a Psychiatric Review Technique of Plaintiff.  (Tr. 385-98).  He found that Plaintiff had the medically determinable impairment of a schizoaffective disorder, as well as a substance addiction disorder that was in early full remission.  (Tr. 388, 393).  Dr. Boyenga determined that Plaintiff did not have the functional limitations to meet the "paragraph B" criteria of Listing 12.04, of 20 C.F.R. Part 404, Subpart P, Appendix 1, as she had only moderate limitations in her activities of daily living, maintaining social functioning, maintaining concentration, persistence, or pace, and no episodes of decompensation.[6]  (Tr. 395).  He also found that the evidence did not establish the "paragraph C" criteria.  (Tr. 396).

---

[6]     Dr. Boyenga also considered Plaintiff for Listing 12.09.  (Tr. 395).  Listing 12.09, substance addiction disorders, includes a cross-reference to nine other Listings; if a claimant has a substance addiction disorder and meets one of the other named Listings, she has met Listing 12.09's requirements.   Listing 12.04, depressive disorders, is included as one of the options for Listing 12.09.

20 C.F.R. Part 404, Subpart P, Appendix 1, 12.00(C)(4): "*Episodes of decompensation* are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace.  Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two).  Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode.  The term *repeated episodes of decompensation, each of extended duration* in these listings means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks."

Plaintiff first saw Dr. Robert Lawton on May 12, 2006. (Tr. 421-22). Dr. Lawton, reviewing Plaintiff's reported history, noted that Plaintiff's depression began about seven years prior, and was triggered by the stress of raising four children in her third bad marriage; Plaintiff denied any history of alcohol abuse. (Tr. 421). Plaintiff reported feeling anxious at night and having fears of snakes or spiders while she slept. (Tr. 421). Dr. Lawton diagnosed depressive disorder and borderline personality disorder, and assessed a GAF score of 53. (Tr. 422). Dr. Lawton found little change in Plaintiff when he saw her on June 30, 2006, noting that her affect was "flat and depressed and she wept without explanation," though Plaintiff reported feeling better with a new medication (Tr. 420). Plaintiff reported to Dr. Lawton at that time that she could not work because of her back pain. (Tr. 420).

On November 17, 2006, Dr. Lawton reported little change in Plaintiff's mental status. (Tr. 437). He noted that she was dressed in dirty clothes and bedroom slippers.[7] (Tr. 437). Plaintiff reported feeling forlorn, hopeless, and helpless, complaining that her efforts to improve her situation made things worse; Plaintiff felt guilty about the way she raised her children and about a conversation with her mother. (Tr. 437). Plaintiff planned to see a therapist, as Dr. Lawton had

---

[7]    In her Memorandum in Support of her Motion for Summary Judgment, Plaintiff appears to try to emphasize that Plaintiff went to an appointment with Dr. Lawton wearing bedroom slippers. (Pltf's Mem. at 5, 15). It appears from Plaintiff's testimony that she often had trouble getting her swollen feet into her shoes that her wearing of slippers is more a reflection of her physical ailments than a sign of a mental problem. (Tr. 12-13). Indeed, Mr. Singley also noted that Plaintiff was wearing slippers at one of her interviews with him, but he discussed this in connection with Plaintiff's physical problems. (Tr. 342).

recommended, within two weeks. (Tr. 437). On March 12, 2007, Plaintiff's care providers at the Robert Young Center, including Dr. Lawton, completed an Individual Treatment Plan for her. (Tr. 430-31). This Plan noted Plaintiff's diagnoses of depressive disorder and borderline personality disorder, as well as a GAF score of 53. (Tr. 430). She visited Dr. Lawton on March 30, 2007, and he noted that there was little change in her mental status at that time. (Tr. 432). Plaintiff felt somewhat worse at this visit because she was no longer taking one of her medications, as her insurance company did not cover it. (Tr. 432).

On April 30, 2007, Dr. Lawton completed a form entitled Medical Opinion Re: Ability to do Work-Related Activities (Mental). (Tr. 426-27). On this form, he opined that Plaintiff was "unable to meet competitive standards" in sustaining an ordinary routine without special supervision, working in coordination or proximity to others without being unduly distracted, asking simple questions or requesting assistance, accepting instructions and responding appropriately to criticism from supervisors, dealing with normal work stress, understanding and remembering detailed instructions, carrying out detailed instructions, setting realistic goals or making plans independently of others, and interacting appropriately with the general public. (Tr. 426-27). Though instructed by the form to do so, Dr. Lawton did not explain these opinions or give the medical or clinical findings that supported them. (Tr. 427). He also opined that Plaintiff had a limited but satisfactory ability to understand and remember very short and simple instructions. (Tr. 426). Finally,

he stated that Plaintiff would be absent from work about four days per month and could not manage her own benefits, if they were awarded.  (Tr. 427).

Dr. Lawton reported that Plaintiff was sad and withdrawn during her appointment on May 11, 2007, due to recently finding out that her mother was dying.  (Tr. 433).  On August 2, 2007, Plaintiff's providers at the Robert Young Center, including Dr. Lawton, completed another Individual Treatment Plan, which did not indicate any change from the March 12, 2007 Plan.  (Tr. 434-35).  Dr. Lawton noted that Plaintiff appeared sadder than usual when he met with her on October 19, 2007.  (Tr. 436).  Plaintiff had just moved into a new apartment, and still felt uncomfortable there; she was preoccupied and briefly wept without explanation during the appointment.  (Tr. 436).  In response to Plaintiff's complaint that she woke very early in the morning feeling shaky and anxious, Dr. Lawton recommended a different schedule for her medications.  (Tr. 436).  Dr. Lawton noted on October 27, 2008 that Plaintiff reported feeling irritable because she had been told by her landlord that she had to move from one building to another.  (Tr. 27).

## III.   Relevant Hearing Testimony

On October 15, 2008, the ALJ held a hearing in Peoria, Illinois on Plaintiff's application for benefits, at which Plaintiff testified.  (Tr. 28-49).  Plaintiff was represented by her attorney, Michael DePree.  Vocational expert Brian Paprocki also testified.

On the date of the hearing, Plaintiff was 46 years old and lived alone in an apartment.  She had received her GED in 1983, and could read and write in

14

English, though she testified that she had a hard time remembering what she read. Plaintiff had last worked in 2001 in an office, filing and answering the phone. Plaintiff had a driver's license, but last drove six months before the hearing. Plaintiff testified that she could take care of her personal hygiene, except that she needed her daughter's help to bathe because she sometimes fell in the bathtub. Otherwise, Plaintiff could take care of her own dressing, bathing, and cleaning. Plaintiff's daughter sometimes also helped her with cooking, laundry, and grocery shopping.

Plaintiff testified that she was unable to work because she could not stand or walk for a long period of time, could not sit for a long time, and could not lift heavy objects. She also noted that she had a problem remembering directions, gets upset if she thinks that she has done something wrong, and doesn't work as fast as others, which was why she lost her last job.

Plaintiff went to bed at night around 10:30 P.M., after watching the news, and got up around 7:00 A.M., but testified that she awoke throughout the night, giving her only about four hours of sleep. During the days, Plaintiff went outside for short walks or to talk with friends, and went to her appointments. Her daughter or a friend usually took her to her appointments. Plaintiff also watched television and read for a few hours each day.

On questioning by her attorney, Plaintiff testified that her chest pains were exacerbated when she was around people she didn't know. In response to the ALJ's questioning, Plaintiff had denied having abused alcohol in the past, and testified

that she quit drinking alcohol three years before; her attorney returned to this point and Plaintiff testified that her doctor had advised her to stop drinking because of gallbladder problems. Plaintiff did not think that she had ever had a problem with alcohol abuse or dependency.

Mr. Paprocki testified that there was no work that would qualify as substantial gainful activity in Plaintiff's past. The ALJ posited a hypothetical person of the same age, education, and experience as Plaintiff, who could perform sedentary work with certain physical limitations, and was limited to work that was simple and routine, and involved only occasional contact with the public and co-workers. Mr. Paprocki testified that such a person could perform jobs in assembly (150,000 jobs nationwide), such as a roller assembler or lampshade assembler, or in administrative support (250,000 jobs nationwide), such as an addresser or document preparer.

## IV. ALJ's Decision

The ALJ issued his decision on December 1, 2008. (Tr. 13-25). After reviewing the applicable law, he noted at Step One that Plaintiff had not engaged in substantial gainful activity since September 28, 2005, the date of her instant application for benefits. He therefore moved to Step Two, where he found that Plaintiff had the severe mental impairments of an affective disorder (either depression or schizoaffective disorder), anxiety, and borderline personality disorder. In making this finding, the ALJ noted Plaintiff's evaluations by Dr. Hermann in

2003 and 2004, her consultative psychological evaluation with Mr. Singley in 2005,[8] her evaluation in October 2005 at the Robert Young Center, the consultative psychological examination with Mr. Singley in February 2006, her evaluations by Dr. Lawton between May 2006 and October 2007, and Dr. Lawton's April 2007 opinion on Plaintiff's ability to do work-related activities. The ALJ explained that he did not give controlling weight to Dr. Lawton's April 2007 opinion, as Dr. Lawton had only seen Plaintiff on three occasions prior to that date, and as the limitations he gave were inconsistent with the GAF scores by Dr. Lawton of March and August 2007, which indicated only moderate symptoms.

At Step Three, the ALJ considered whether Plaintiff's severe mental impairments met or medically equaled any of the impairments listed at 20 C.F.R. Part 404, Subpart P, Appendix 1, specifically considering Listings 12.04, 12.06, and 12.08. Each of these Listings includes an identical paragraph B, which requires "at least two of the following: 1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration." The ALJ found that Plaintiff had at most a mild restriction in activities of daily living, moderate difficulties in social functioning, and moderate difficulties with concentration, persistence, or pace; there was no evidence of repeated episodes of decompensation. Listings 12.04 and 12.06

---

[8]     The ALJ refers to both a Paul and a Stephen Singley. The signature on the reports by Mr. Singley shows his name to be Stephen Paul Singley, so it appears that both references are to the same person; in addition, the dates and record citations given by the ALJ match up with the reports by Stephen Singley.

provide for alternative paragraph C criteria, as well, which the ALJ found to be lacking in Plaintiff's case.[9]   The ALJ also considered the combined effect of Plaintiff's physical and mental impairments, and found that she did not meet or medically equal the requirements of any Listing.

The ALJ next determined that Plaintiff had the RFC to perform sedentary work, with certain physical limitations, and with the mental limitations of only simple, routine tasks with only occasional contact with the public and co-workers. As to Plaintiff's mental abilities, the ALJ noted again that he did not give controlling weight to Dr. Lawton's opinion of Plaintiff's work-related mental limitations.[10]   He explained that Dr. Herrmann, who was Plaintiff's treating psychiatrist and had seen her for many years, noted that she had only mild symptoms.  Further, he cited records from the Robert Young Center indicating only moderate symptoms, as revealed by a GAF score of 53, and noted that Plaintiff's

---

[9]   Listing 12.04, paragraph C requires:
Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: 1. Repeated episodes of decompensation, each of extended duration; or 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.
Listing 12.06, paragraph C requires a "complete inability to function independently outside the area of one's home."

[10]   The ALJ first discussed the extent to which Plaintiff's statements as to her physical abilities were credible, given her reported daily activities, and found that they were not credible to the extent that they would preclude sedentary work.

other physicians failed to note the extreme limitations suggested by Dr. Lawton.  In addition, the ALJ repeated his observation that Dr. Lawton had seen Plaintiff only three times before issuing his opinion as to her work-related limitations.  The ALJ instead relied on the March 2, 2006 Mental RFC assessment by the state agency psychologist Dr. Boyenga, who found Plaintiff to be only moderately limited in her ability to understand, remember, and carry out detailed instructions; to maintain attention for extended periods; or to work in close proximity with others or to interact with the general public.  He also concurred with Dr. Boyenga's March 2, 2006 finding of only moderate limitations in daily living, social functioning, and maintaining concentration.

After determining that Plaintiff was unable to perform any of her past relevant work, that she was a "younger individual," that she has a high school education and is able to communicate in English, and that transferability of job skills was not material under Social Security Ruling 82-41, the ALJ found that there was a significant number of jobs in the national economy that Plaintiff could perform.  The ALJ relied on the vocational expert's testimony, which was consistent with the Dictionary of Occupational Titles, that a person with Plaintiff's RFC could perform occupations such as rotator assembler, lamp shade assembler, addresser, or document preparer, which exist in significant numbers in the national economy.  As Plaintiff could perform these jobs, the ALJ found that she was not disabled.

### DISCUSSION

Plaintiff contends that the ALJ erred in three ways: (1) by discounting the opinion of Dr. Lawton, (2) by determining a mental RFC that did not include limitations that the ALJ had found to be warranted, and (3) by failing to properly consider Plaintiff's credibility.  The Court finds that the ALJ's analysis was proper.

## I.   The ALJ properly considered the opinion of Dr. Lawton

Plaintiff argues that, because Dr. Lawton was her treating psychiatrist, the ALJ should have given his opinion as to her work-related limitations controlling weight.[11]  (Pltf's Mem. at 14-26).  As noted above, the Dr. Lawton opined on April 30, 2007 that Plaintiff was "unable to meet competitive standards" in a variety of work-related abilities, that she would be absent from work about four days per month, and that she would not be able to manage her own benefits.

A treating physician's opinion is entitled to controlling weight only if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 416.927(d)(2).  The ALJ declined to give Dr. Lawton's opinion controlling weight at two stages: at both Step Two, in determining whether Plaintiff had an impairment that significantly limits her mental ability to do basic work activities, and in determining Plaintiff's mental RFC.  At Step 2, the ALJ noted that Dr. Lawton had only seen Plaintiff three times before issuing his opinion, and that

---

[11]   In connection with this, Plaintiff argues that the vocational expert's testimony is therefore unreliable, as it is based on the hypothetical questions posed by the ALJ, which did not include the limitations Dr. Lawton found.  As the Court finds that the ALJ's consideration of Dr. Lawton's opinion was proper, this does not undermine the vocational expert's testimony.

the April 2007 opinion was inconsistent with the GAF scores of 53 assessed in the March and August 2007 Individual Treatment Plans, signed by Dr. Lawton, which indicated only moderate symptoms.[12]   He rejected Dr. Lawton's April 2007 opinion again when assessing Plaintiff's mental RFC, citing the same two reasons, as well as noting that Dr. Herrmann had found only mild limitations.

It was proper for the ALJ to determine that Dr. Lawton's April 2007 opinion was not entitled to controlling weight.   First, it was not supported by medical evidence.   Though instructed by the Medical Opinion form to do so, Dr. Lawton did not explain his opinions or state the medical or clinical findings that supported them.   He also saw Plaintiff on a limited number of occasions before rendering this opinion, which undermines the rationale for giving the treating physician's opinion controlling weight.[13]   *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) (*citing* Social Security Ruling 96-2p; 20 C.F.R. § 404.1527(d)(2); 20 C.F.R. § 404.1527(d)(5); Social Security Ruling 96-7p) (where detail and long-term relationship are absent, reasonable to discount treating physician's opinion).   Further, the April 2007 opinion was inconsistent with other substantial evidence, including that from Dr. Lawton, as noted by the ALJ.   Dr. Lawton concurred in Plaintiff's Individual Treatment Plans in both March and August 2007, which assessed GAF scores of 53.

---

[12]   Both Plaintiff and Defendant agree that a GAF score of 53 indicates moderate symptoms.

[13]   The ALJ noted that Dr. Lawton only saw Plaintiff three times before issuing this opinion, but the Court has counted four visits with him prior to April 2007. Such a minor discrepancy makes no difference; the point is that Dr. Lawton did not have a long-term treating relationship with Plaintiff when he issued his opinion as to her abilities.

Dr. Lawton himself thus found Plaintiff to be only moderately limited.  In addition, none of Plaintiff's other treating physicians found Plaintiff to be so limited as did Dr. Lawton.  Indeed, Dr. Herrmann recommended that Plaintiff attempt to return to work.  Finally, the ALJ had the state agency psychologists' opinions on which to rely; they found that Plaintiff's limitations were no more than "moderate," based in part on Dr. Lawton's observations.

Plaintiff takes issue with the ALJ's reliance on Dr. Lawton's assessment of a GAF score of 53 for Plaintiff, arguing that his assessment of that score was not intended to evaluate her employability.  (Pltf's Mem. at 19).  Plaintiff is correct that Dr. Lawton was not specifically assessing her employability when noting her GAF score - a GAF score is an opinion of a patient's worst symptom or functional limitation, and is designed to make treatment decisions.  *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (*quoting* AM. PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (Text Revision, 4th ed. 2000)) ("final GAF rating always reflects the worse of" symptoms or functional level).  However, as the GAF score is intended to reflect the *worst* limitation, it is inaccurate to imply, as Plaintiff does, that it was overly optimistic as applied to Plaintiff's abilities in the workplace.  Instead, the ALJ reasonably relied on Dr. Lawton's GAF score to show that, when he was evaluating Plaintiff objectively, even Dr. Lawton found her worst limitation, including her functional limitations, to be only moderate, which was inconsistent with Dr. Lawton's opinion that she could not work.  Even more importantly, Dr. Lawton did not provide any objective medical explanation for his

April 2007 opinion, or for why it conflicted with his earlier assessment of a GAF score of 53.

Plaintiff also argues that the ALJ was not entitled to rely on Plaintiff's medical records from 2004 to discount Dr. Lawton's April 2007 opinion, as her condition deteriorated from 2004 to 2006 and 2007, when she saw Dr. Lawton.[14] (Pltf's Mem. at 20).   Even if Plaintiff's 2004 records are not sufficient alone to undermine Dr. Lawton's opinion, the facts that Dr. Lawton did not explain his opinion, saw Plaintiff on a limited number of occasions prior to April 2007, and rendered an opinion inconsistent with his previous and subsequent assessments of Plaintiff are sufficient to justify the ALJ's decision that Dr. Lawton's April 2007 opinion was not entitled to controlling weight.

Plaintiff argues, citing *Gudgel v. Barnhart*, that "the non-examining agency report is not substantial evidence weighed against the reports of [Mr.] Singley and Dr. Lawton." (Pltf's Mem. at 24 (*citing* 345 F.3d 467, 470 (7th Cir. 2003)).  First, as to Dr. Lawton's opinion, the Court finds that Plaintiff's argument is not well-founded.   In *Gudgel*, the Seventh Circuit noted that the "ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Gudgel*, 345 F.3d at 470.  Here, as discussed above, the ALJ had ample "reasons supported by substantial evidence in the record" other than the contradictory report by Dr. Boyenga to reject Dr. Lawton's opinion: Dr. Lawton

---

[14]    The Court notes that Mr. Singley examined Plaintiff in 2003, 2005, and 2006, and found almost no change in her between these dates, which undermines the claim that Plaintiff had significantly deteriorated between 2004 and 2006/2007.

failed to explain or give medical corroboration for his opinion, Dr. Lawton had a limited treating history with Plaintiff, and Dr. Lawton's opinion was inconsistent with his own treatment notes. *See also Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006) ("once well-supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight"). Plaintiff further argues that Mr. Singley's February 2006 report supports Dr. Lawton's April 2007 opinion, and that the ALJ should not have relied on Dr. Boyenga's opinion. (Pltf's Mem. at 23-24). Mr. Singley's February 2006 report does not necessarily lend support to Dr. Lawton's opinion, as Mr. Singley did not suggest any particular work limitations. In addition, Mr. Singley's report, even if somewhat supportive, does not overcome the deficiencies of Dr. Lawton's April 2007 opinion - the failure to explain the opinion, limited treating history, and inconsistency with Dr. Lawton's own treatment notes.

Plaintiff also asserts that Dr. Boyenga's March 2006 Mental RFC assessment and psychiatric review technique were not reliable, as they were "inconsistent" with Mr. Singley's report and were not based on medical evidence. Dr. Boyenga reviewed Mr. Singley's report and relied on it to opine that Plaintiff was not disabled. "State agency…psychological consultants…are highly qualified…psychologists who are also experts in Social Security disability evaluation." 20 C.F.R. § 416.927(f)(2)(1). Moreover, Mr. Singley's opinion itself is not entitled to any special weight when compared to that of Dr. Boyenga, and it is the ALJ's province to determine which pieces of evidence are to be believed; there is no indication that his weighing of this

evidence was unreasonable.  Where Dr. Boyenga considered Mr. Singley's opinion in making his assessment of Plaintiff, the ALJ was entitled to rely on Dr. Boyenga's report.

Finally, Plaintiff argues that Dr. Lawton's opinion is entitled to deference even if it is inconsistent with the record as a whole.  (Pltf's Mem. at 24-25).  The ALJ determined that Dr. Lawton's April 2007 opinion was not entitled to controlling weight.   There is no indication, though, that the ALJ entirely disregarded Dr. Lawton's opinions; rather, he considered them along with the other evidence.  *See also Hofslien*, 439 F.3d at 377 (once ALJ determines that treating physician's opinion not entitled to controlling weight, "the treating physician's evidence is just one more piece of evidence for the administrative law judge to weigh").

The Court finds that the ALJ's determination that Dr. Lawton's April 2007 opinion was not entitled to controlling weight was reasonable, and that his acceptance of Dr. Boyenga's opinion was proper.

## II.    The ALJ's nonexertional RFC properly includes the limitations that are supported by the record

Plaintiff next argues that the ALJ improperly excluded limitations that he found to be warranted from his assessment of Plaintiff's RFC, and that his questions to the vocational expert were therefore defective and unreliable.[15]  (Pltf's Mem. at 26-30).  Plaintiff takes issue with Dr. Boyenga's and the ALJ's conclusions that Plaintiff could perform "simple" tasks, stating that the term "simple" "utterly

---

[15]    As noted above, Plaintiff does not challenge the ALJ's physical RFC finding. (Pltf's Mem. at 3).

fails to include the limitations in attention, concentration, persistence and pace."[16]
(Pltf's Mem. at 27).

Plaintiff relies on testimony by vocational expert Paprocki in a 1996 Eighth
Circuit case. (Pltf's Mem. at 27). In this case, *Newton v. Chater*, the Eighth Circuit
observed that the ALJ found that the claimant "often" had deficiencies of
concentration, persistence, or pace, based on the medical evidence:

> Dr. Scott found that Newton had moderate deficiencies in his ability to
> carry out detailed instructions, maintain attention and concentration
> for extended periods, perform activities within a schedule, maintain
> regular attendance, be punctual within customary tolerances, complete
> a normal work week, and perform at a consistent pace without an
> unreasonable number and length of rest periods. Dr. McDonough
> found that Newton was markedly limited in his ability to carry out
> detailed instructions and moderately limited in his ability to maintain
> attention and concentration for extended periods. Consistent with
> these findings, the ALJ stated on the Psychiatric Review Technique
> Form attached to the decision that Newton "often" has deficiencies of
> concentration, persistence, or pace.

92 F.3d 688, 695 (8th Cir. 1996). In his question to the vocational expert, though,
the ALJ only asked about a person who could perform "simple" jobs. Mr. Paprocki
testified in that case that "A moderate deficiency in [concentration, persistence, or

---

[16]    To the extent Plaintiff relies on Dr. Boyenga's finding, in the context of
determining whether she met any of the Listings in the Psychiatric Review
Technique, that she had moderate difficulties in maintaining concentration,
persistence, or pace, such reliance is misplaced. (Tr. 395). This finding is not an
RFC assessment, but was made in order to assist with the determination of whether
Plaintiff met a Listing at Step Three. *See* Social Security Ruling 96-8p ("the
limitations identified in the 'paragraph B' and 'paragraph C' criteria are not an RFC
assessment but are used to rate the severity of mental impairment(s) at steps 2 and
3 of the sequential evaluation process. The mental RFC assessment used at steps 4
and 5 of the sequential evaluation process requires a more detailed assessment by
itemizing various functions contained in the broad categories found in paragraphs B
and C of the adult mental disorders listings in 12.00 of the Listing of
Impairments").

pace],…would cause problems on an ongoing daily basis, 'regardless of ... what the job required from a physical or skill standpoint," because they "related to basic work habits needed to maintain employment."[17]  *Id.*  The Eight Circuit held that, given the limitations found by the ALJ, the term "simple" did not adequately capture the claimant's limitations.  *Id.*

As pointed out by Defendant, it must first be noted that Plaintiff never questioned Mr. Paprocki's testimony at the hearing, and, where a vocational expert's testimony is unchallenged, the ALJ is entitled to rely on it.  *Donahue v. Barnhart*, 279 F.3d 441, 446-47 (7th Cir. 2002) ("When no one questions the vocational expert's foundation or reasoning, an ALJ is entitled to accept the vocational expert's conclusion").  Further, an RFC and resulting hypothetical to the vocational expert that include a limitation to "simple" tasks for claimants with moderate limitations in concentration, persistence, or pace has been approved by the Seventh Circuit in *Simila v. Astrue*, 573 F.3d 503, 521-22 (7th Cir. 2009) (*quoting Sims v. Barnhart*, 309 F.3d 424, 431 (7th Cir. 2002)).  For that matter, the Eighth Circuit itself later observed that a hypothetical involving "simple, repetitive, routine tasks adequately captures [a claimant's] deficiencies in concentration, persistence or pace."  *Howard v. Massanari*, 255 F.3d 577, 582 (8th Cir. 2001).  In *Howard*, the state agency psychological consultant, just as did Dr. Boyenga here,

---

[17]    The Court notes that the implication of Plaintiff's argument appears to be that, based on Mr. Paprocki's testimony in *Newton*, in every case where there are moderate limitations in concentration, persistence, or pace, a claimant must be found to be disabled.  She paraphrases Mr. Paprocki's testimony to say that "moderate limitations in those areas would cause problems on an ongoing daily basis regardless of what the job required from a physical or skill standpoint."  (Pltf's Mem. at 28 (*citing Newton*, 92 F.3d at 691)).

issued opinions both as to the medical severity of the claimant's impairments and as to his RFC - he found that the claimant would "often hav[e] deficiencies of concentration, persistence or pace," *and* that he could "perform at least simple, repetitive, and routine cognitive activity." Here, Dr. Boyenga found that the medical severity of Plaintiff's condition resulted in moderate difficulties with concentration, persistence, or pace, but also that she could perform simple, routine, and repetitive tasks.[18] (Tr. 383, 395). Thus, even under the Eighth Circuit's analysis, the adoption of Dr. Boyenga's opinions and resulting hypothetical involving "simple" tasks was not error. The term "simple," though it is not as

---

[18]      Moreover, *Newton* is distinguishable from the instant case. In *Newton*, the claimant had at least "moderate deficiencies in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, complete a normal work week, and perform at a consistent pace without an unreasonable number and length of rest periods," and the ALJ specifically found that the claimant would "often" have deficiencies of concentration, persistence, or pace. *Newton*, 92 F.3d at 695. Here, as to these types of problems, Dr. Boyenga's mental RFC assessment found moderate limitations only in understanding and remembering detailed instructions, carrying out detailed instructions, maintaining attention and concentration for extended periods, working in coordination with or proximity to others without being distracted by them, completing a normal workday and workweek without interruptions from psychologically based symptoms, and performing at a consistent pace without an unreasonable number and length of rest periods. (Tr. 381-82). He found that Plaintiff was not significantly limited in her ability to remember locations and work-like procedures; to understand and remember very short and simple instructions; to carry out very short and simple instructions; to perform activities within a schedule, to maintain regular attendance, and to be punctual within customary tolerances; and to make simple work-related decisions. (Tr. 381). Unlike the *Newton* claimant, Plaintiff has no significant limitation in her ability to perform activities within a schedule, to maintain regular attendance, and to be punctual within customary tolerances - this is a significant difference when it comes to "basic work habits needed to maintain employment." *Newton*, 92 F.3d at 695. The only moderate limitations Plaintiff has that the Newton claimant did not also exhibit involve working around others, which are accounted for by the RFC limitation to only occasional contact with the public and co-workers.

precise as could be wished, is adequate to convey the idea of moderate limitations in concentration, persistence, or pace to a vocational expert.

Dr. Boyenga determined that Plaintiff could perform "simple tasks" that were "routine and repetitive." (Tr. 383). Plaintiff contends that, as this was not a medical conclusion, Dr. Boyenga was not qualified to give an opinion on it. (Pltf's Mem. at 26). On the contrary, as he was a state agency psychologist who is an expert in the application of medical findings to the disability rules, his opinion and conclusions were entitled to consideration by the ALJ, even as to Plaintiff's RFC, an issue reserved to the ALJ. 20 C.F.R. § 404.1527(f)(2)(i); Social Security Ruling 96-6p ("RFC assessments by State agency medical or psychological consultants or other program physicians or psychologists are to be considered and addressed in the decision as medical opinions from nonexamining sources about what the individual can still do despite his or her impairment(s).").

Further, Plaintiff argues that "longstanding Social Security policy also indicates that even simple work requires the ability to adequately perform the same mental tasks contained in [Dr.] Boyenga's RFC report…[Simple, routine work] requires the abilities to understand, remember, and carry out simple instructions." (Pltf's Mem. at 28). Dr. Boyenga's report, along with other evidence, shows that Plaintiff had the ability to understand, remember, and carry out simple instructions. (Tr. 381). In addition, both Dr. Brister in May 2005 and Dr. Lawton

in April 2007 opined that Plaintiff would be capable of handling simple tasks, notwithstanding her problems with attention.[19]

Thus, though the use of the term "simple" to describe unskilled work is less than perfectly precise, and should be replaced by more descriptive terms, the ALJ's hypothetical to the vocational expert adequately captured Plaintiff's documented limitations and resulted in reliable testimony from the vocational expert.

## III.   The ALJ properly considered Plaintiff's credibility

Finally, Plaintiff argues that the ALJ improperly found that her allegations were not completely credible.  (Pltf's Mem. at 30-34).  It is apparent to the Court that the ALJ's single conclusion as to Plaintiff's credibility was in the context of her physical limitations, and the ALJ's findings as to Plaintiff's physical limitations are not here challenged by Plaintiff.  (Tr. 23-24).  The ALJ, in assessing Plaintiff's RFC, found first that she had certain physical and mental conditions, both of which could be expected to produce certain limitations.   He next reviewed Plaintiff's daily activities, and found that those activities were "consistent with the performance of the restricted range of sedentary work as noted above and are similar to work functions," contrary to Plaintiff's allegation of disabling physical limitations.   The next paragraph of his opinion deals further with Plaintiff's physical complaints, and with the demands of sedentary work.[20]   The following paragraph finally discusses

---

[19]    Dr. Brister stated that Plaintiff had "difficulty w[ith] attention which will limit [her] to simple 1-2 step operations of a routine, repetitive nature."  (Tr. 204-06).   Dr. Lawton noted that Plaintiff had a limited but satisfactory ability to understand and remember very short and simple instructions.  (Tr. 426).

[20]    Plaintiff here takes issue with the ALJ's discussion of Plaintiff's credibility as to her physical limitations, and his reliance on her daily activities; however, as

Plaintiff's mental limitations.   In that paragraph, the ALJ does not mention Plaintiff's credibility at all, but instead discusses his decision not to give Dr. Lawton's April 2007 opinion controlling weight, which, as discussed above, was proper.   As the ALJ did not determine that Plaintiff was non-credible as to her mental limitations, there was no need for him to specifically discuss her credibility as to these limitations.

Moreover, Plaintiff was not fully credible as to her mental limitations, as her testimony conflicts with the medical records and with her own prior statements, and as she had been inconsistent with her reports regarding alcohol abuse to her various care providers and to the ALJ.   First, Plaintiff reported to Dr. Lawton that she was unable to work because of her back pain; she did not mention her mental limitations as a reason for her alleged inability to work.   The Court finds this to be strong evidence undermining Plaintiff's current claim that her mental impairments prevent her working.   Social Security Ruling 96-7p ("[A]djudicator must compare statements made by the individual in connection with his or her claim for disability benefits with statements he or she made under other circumstances… .   Especially important are statements made to treating or examining medical sources.").   In addition, as noted above, Plaintiff denied during the hearing that she had ever had a problem with alcohol abuse or dependency.   She also reported to Ms. Jordan and Dr. Lawton that she had never abused alcohol.   However, Mr. Singley found that Plaintiff had a history of alcohol abuse, and that she experienced periodic

_____

noted above, Plaintiff has specifically waived any allegation of error in the ALJ's determination of her physical capacities.   (Pltf's Mem. at 3).

remissions from that condition.  Plaintiff's testimony and her reports to Ms. Jordan and Dr. Lawton were thus inconsistent with the other evidence in the record, and served to undermine her overall credibility.  Social Security Ruling 96-7p (consistency of testimony with other evidence is a "strong indication" of credibility).

Plaintiff further argues that the ALJ improperly ignored Plaintiff's testimony as to her ability to understand and remember things, and as to her fear of others and social isolation.  (Pltf's Mem. at 33).  On the contrary, both of these subjects are covered in the medical records cited by the ALJ, and are included in the mental RFC assessed by the ALJ in the limitation to work involving only occasional contact with the public and co-workers.

The Court thus finds that the ALJ's credibility findings "find some support in the record and are not patently wrong."  *Herron v. Shalala*,  19 F.3d 329, 335 (7th Cir. 1994).

### CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment (Doc. 13) is DENIED, and Defendant's Motion for Summary Affirmance (Doc. 14) is GRANTED.  CASE TERMINATED.

Entered this <u>15th</u> day of July, 2010.

s/ Joe B. McDade
JOE BILLY McDADE
United States Senior District Judge
